WHAT TO DO IF WINDS TAKE CARE OF YOU Mr. Berenardo. Mr. Otto. Attendee by Reserve for three minutes please. Good. You may proceed. Thank you very much. Please, Court, throughout this case, Jacobs contested infringement up until pre-trial. In the pre-trial, they came into the pre-trial conference and they admitted to rampant infringement of a number of claims. We've listed them in the brief. The court discussed them in its opinion. And for reasons not particularly clear, it then decided to disregard them. And I want to make the point that at the pre-trial conferences were criticized somewhat in our brief for not pointing to any kind of a transcript. There was no transcript. So it was just in chambers with the judge. There was no transcript. And Jacobs and Danaher admitted to infringement of a number of claims, including Claim 10. They admitted to infringement at the pre-trial. But he corrects that, right? He corrects that admission, right? Never. No. In fact, they made the admission repeatedly during trial and they made the admission during their pre-closing statements. But Jacobs, if I understand the record, had contested the underlying independent Claim 9 throughout. And then went back and corrected its admission as to the dependent Claim 10. Do I have that basically correct as to the record? Not correct, Your Honor. Don't just tell me it's not correct. The other side tells me it's absolutely correct. Claim 9 is a dependent claim. So Claim 9 is dependent upon Claim 6. Which was contested all the way along. No. Claim 6 was admitted. Claim 6 was admitted. They contested Claim 9. And they admitted to infringement repeatedly at pre-trial, during trial, and their post-closing arguments. Where's the prejudice to you here? Well, Your Honor, I mean, when you go in trial and they admit to infringement, we're entitled to rely on admissions. There's no need for us to prove facts that are not in dispute. And infringement is a finding of fact. In fact, at one point in his discussion, Counsel for Jacobs, Mr. Klein, went on to discuss, you know, basically why are we going out for supercharging, et cetera, when those are not material to any issue involving infringement. And so, therefore, we were prejudiced by the fact that we were, we changed our trial strategy, if you will, on the eve of trial, due to Jacobs' admission. But I don't understand how you can say that Claim 10 isn't dependent on Claim 9. It is. So the status as claimed in Claim 9. No, I'm sorry. Early Judge Rader said it was independent in Claim 9, and I said Claim 9 is dependent upon Claim 6. Okay, but they were contesting Claim 9 all the way along. That's correct, Your Honor. And Claim 10 is dependent on Claim 9. Claim 10 is dependent upon Claim 9. That's correct. And so they admitted to claim infringement. They made a mistake, and the judge allowed them to correct it. Well, but we were not allowed to correct it. We were not allowed to correct it. They admitted to it at the pre-trial. They admitted to it repeatedly during the trial. And so in their post-closing arguments, in fact, Mr. Mead, in his post-closing arguments, said, let me check to make sure I'm not making a mistake. He goes on and recites the particular point. But the admittance here come at the close of trial, after you've made all your arguments and they've made all theirs, right? That's not correct. They made it in the pre-trial, and they made it repeatedly during trial. Repeatedly during trial, they said, we admit that we infringed. When we come here, Mr. Coyne says, it's a big admission that we're making. Sorry. He goes on and expounds about what a big deal it is. We're not fooling around. This is a major thing for us to do at trial, and let's move on on validity. That was their source, was validity. And so, therefore, we relied on that. And, you know, we were shocked when the opinion comes out and the judge says, well, I'm sorry I made a mistake. Because we were informed of that. And, you know, if somebody had made a mistake in admission, certainly we should have been given an opportunity to respond. Because we were not given that opportunity. Can you, by the way, just show me in the record where it occurred in pre-trial? I can't. There's no record of pre-trial. So we're going on your... The judge himself writes to her. He says here, which is at 89.6. The judge says, let me ask you where we are here. When we spoke on Friday, January 5, 2007, after they had a pre-trial, Jacob was prepared to concede infringement. We talked about the need for some evidence to evaluate, but they will need to evaluate the merits of the invention or lack of merits of the invention. So they made it as a pre-trial. And then if you look at our 41 pages, 33 of our reply... Well, but that's not specific to Claim 10, is it? Well, that particular portion is not. But the next portion... Because they always conceded infringement of a number of things. No, they did not always.  It was at the pre-trial that they made that admission, Your Honor. And they continued it throughout the trial. But following up, in our brief complaint to Mr. Coyne, specifically said, Your Honor, in our view, none of this goes to the end of this material indication because the issue of infringement on Claim 10, we have conceded. We agreed with Your Honor at the final pre-trial conference. Our product works that way. So he's telling you that the pre-trial conference, they conceded infringement of Claim 10. He said our product works that way. And we were prejudiced because we were not infringed. We had no reason to contest that. They didn't contest it. It was not until after this opinion came out that all of a sudden Claim 10 became inflicted from an infringement point of view. Well, I don't see the prejudice because in order to show infringement of Claim 10, you'd have to show infringement of Claim 9. Your Honor, I don't have to prove what's not in the statute. In Claim 10, the infringement of Claim 10 is not in the statute. No, but the question is how you're prejudiced. At the trial, you addressed Claim 9, right? We addressed Claim 9. And the jury found it against you. No, it was not a jury trial. It was a bench trial. A bench trial, yeah. Well, there's nothing to find. The Caligari case that we cite specifically said it's an abuse of discretion for a court to ignore the admission that was made before the trial. In Caligari, in fact, the party admitted to infringement before the trial. They contested infringement during the trial. And the judge sent the case to the jury. The jury found non-infringement in this court reversed. There was no requirement of prejudice. It simply said that's the situation you made it. You're stuck with it. Sorry you made it. And that's the situation you're here. Could I move you to another question? And that is with respect to the claims that the district court found obvious, there are claim construction issues here. And it struck me that the claim construction issues which you're here now to be trying to argue were not argued below or, in fact, were conceded below. And can you show me, for example, where the delayed compression relief construction of Claim 1, for example, was argued below? Well, in fact, that's exactly what the lower court found. The lower court found it was a properly timed intervention. No, no, no. That's not the question. The question is did you argue this below? We argued it. We did argue it. I was cited to the testimony that you admitted it to me. I want to see where you argue it as a question of claim construction. Because it seems to me that one of the major differences between the parties is how to construe these claims for purposes of the obviousness analysis. And Mr. Coyne argues that you waived this. And I'm trying to find out whether you did waive it or not. We argued it, Your Honor. It's in our reply brief. We point you to the testimony of the inventor. We found that by timing significance. What page are you on? It's in the record page 305 or 308. The judge himself. I don't think the inventor's testimony is a claim construction argument. Where did you argue this as a claim construction issue? It never really came up with a claim construction issue. Is that the problem? Well, it may be a problem, Your Honor, because it came out later. So the judge then changed the claim construction. What we argued throughout this was that the inventor had a properly timed engine brake operating at a properly set exhaust rate. With the result that he floated the valve on an intake strip so that air flowed in to supercharge that cylinder. And the issue that the court looked at was, you know, what does opening mean? What's an open exhaust valve? And did the claim require air flow into the cylinder? You're addressing a different issue. But let's turn to the trap charge and supercharging. It struck me in reading the record that you had conceded that the district court's view that those were not part of Claim 1 during the proceedings below. No? We agreed that claim does not keep the claims. And I want to point out that Claim 1 is a reputable claim. Claim 6 and Claim 11 are means plus function claims. So they're considered a little differently from a construction point of view. But what we conceded was that there's no express presentation in the claim of supercharging or trap charging. What we said was, if you do what is claimed, the necessary result of that is trap charge or supercharging because you open that valve and you allow air to flow in to the cylinder so that when the piston starts on the following compression stroke, you have that increased charge which gives you the performance gain that misdeterminable effect. And that's what we argued below. And the district court agreed, and the parties all agreed, that the proper construction, particularly of the apparatus claims with their means plus function, was a properly timed engine brake operating in combination with a properly set exhaust brake so that you open the valve late on its intake stroke. And the court construed an open exhaust valve to be one where air would flow into that cylinder. That's what the invention was all about. That's what misdeterminable effect. There's no far-arc that this court had before that shows that combination. In fact, there's no testimony in the record about the combination which the district court relied upon to invalidate the claims. The district court relied on open-door and safe-door. And you are welcome to peruse the record, but there is absolutely no testimony of any of this as to why that combination would be obvious. Okamura discloses, to some degree, all elements of Claim 1, right? We disagree, Your Honor. We believe that open-door, you have to pick and choose in open-door. You can find little words here and there. Okamura, in fact, has what we call more embodiments. There's essentially two embodiments. There's one embodiment where he uses the special purpose third valve. The judge found that that was not an exhaust valve. Jacobs has not appealed that finding. He found that the power card uses the third valve, right? They all do. But Okamura was one of a series of articles and applications by an institution on its power card and partner, which used that special purpose third valve. One of these references, though, says that you could also use the exhaust valve. Okamura says you can use an exhaust valve, Your Honor. But it says it in the context of the special purpose can. The bubble-bubble can, which is similar to the Dynapart can. The Dynapart can, with the exhaust brake, was tested by Matt Trott. We have testimony in the record from Mr. Peacock, inventor of the Dynapart brake, who said Matt tested a Dynapart engine brake with an exhaust brake with that particular can, and you got no performance. In fact, you got a mouthful. But Jacobs has argued in her appeal that you always get a mouthful. Mr. Peacock testified that there was no such mouthful. Jacobs tested the Dynapart with an exhaust brake. They got no mouthful, and they got reduced performance. Hatbrake itself tested the Dynapart with an exhaust brake, and we got none. So the district court correctly found that the court in my case talks about using an exhaust valve. It was not enabled. For anticipation purposes. For anticipation purposes. But Jacobs does not appeal that finding. What Jacobs has never done in the district court kind of business is, okay, it's not enabled. Where does the program teach you to fix a problem? Or how to fix a problem? Jacobs sits here now, and they go, well, you can do this, you can do that, but the reality is, when they test the Dynapart with the exhaust brake, they input those fixes in. In fact, Jacobs tested the 3406 Caterpillar, which was the engine that Mr. Mueller worked on. They tested a combination, and they said, we don't recommend the combination, because of the concerns for valve flow. Valve flow was something that the industry did not want. Mr. Meistert tells you in his memo. The district court found that it was tolerated by the industry. It could be tolerated, Your Honor, which is true. Some people would have a limit. Detroit Diesel, Mr. Meistert gave his memorandum, which we cited to you, says Detroit Diesel, one of the largest engine makers, would not tolerate valve flow. So, valve flow was one of those things that sometimes it happened, sometimes it didn't. They tried not to have it, because of concerns for what could do to the engine, the turbocharger. It had all sorts of bad effects. So, I see my lady. Mr. Perinato, yes, you used your rebuttal time. We'll restore the rebuttal time, give him three minutes, and then give Mr. Coyne an additional three, if he needs to use it, all right? Keeps the time even. Mr. Coyne. Thank you, Your Honor. Yes, please, Your Honor. With me at the table is Mark Austin and Chris Meade, who are listed in the chart below. Your Honor, there really are two fundamental issues here, and that is the claim construction of the supercharging and the claim construction on the but-for causation. I'd be happy to answer any of the Court's questions. Yeah, well, you're going to have to start someplace else with me. Where does the trial court consider secondary considerations, even consider them? It starts at page 51. 51. Well, no, that's interestingly the only place I could find any opinion at all, and that is citing the Graham v. Deere. Yes, Your Honor. It is not consideration of secondary considerations. The Court finds in a number of these files about valve flow extensively in the 74-page opinion. It starts at page 13 and 14. It goes to 17. There are questions about codes, whether some manufacturers did not like valve flow. Other manufacturers, like Williams, were actively encouraging that there were plenty of people capturing it. It continues to be the subject of Pat Gray's T-37 records, and he did not find commercial success, but he does find that it basically enabled Pat Gray to enter the market as an engine brake manufacturer. So there's the argument. You're not setting forth the facts. That really isn't considering secondary considerations as an aspect of obviousness, is it? Well, Your Honor, I think he did consider them. He doesn't articulate that expressly in the discussion. At all? Well, Your Honor. Is that a problem? No, Your Honor. In his findings, very explicitly, the Court had a three-week trial, heard dozens of witnesses, and entertained a number of findings on these points, and what he found is that the references are so clear. Okamura does have all the evidence. What about the secondary concern? What would argue down below about the secondary considerations? I can't. The district court briefs or whatever that articulate these arguments are not in the record and not available. So what was argued? What did you argue about secondary considerations to the district court? What we argued is that there was no commercial success because this brake enjoyed literally a T-37, a Pat Gray's brake, the sole pump brake that we provide. It may have been very significant just immediately. I don't want to denigrate that. But this is an objective standpoint. Did you argue lack of nexus? We did argue lack of nexus. And he did make an explicit negative finding on that, but he definitely did not find that the T-37 was a commercial success of the extension. What he said is that the T-37 enables Pat Gray to be a manufacturer of engine brakes. With respect to what was argued below, copying, long-felt need, failure of others, commercial success, and this teaching away on felt floats. The opinion and the record is replete. And we put many of those sites in order. Other than your argument, did you submit any evidence showing a nexus between the secondary considerations and the feature? We believe we submitted evidence showing that there wasn't a nexus. We had cross-examined Mr. O'Neilly. During that cross-examination, he stated that he had sold the brake a week. Keep in mind, there's different claims here. When you say commercial success of the invention, there's an invention of claims 2, 4, 9, 10, and 14 that requires a delay in the pressure pulse, delay in the timing, to cause a big enough pressure pulse that it's going to flow down the exhaust manifold and push that valve open, supercharge the cylinder, trap the charge, and get you increased retarding horsepower. There is no evidence that anybody on this record, that anybody had ever done that. And the court so found. Well, the court seemed to think there was an invention here that just wasn't claimed in claim 1 and the other claims that were found to be obvious. But it would have been a good thing to make some findings about secondary considerations and the lack of nexus between commercial success and these other things and what was claimed in claim 1 as opposed to what might have been claimed in claim 1 but wasn't. Well, if you run a nexus, that's the second category. The rest of the claims simply require a combination achieving valve flow for 1, 5, 6, and 9. Yeah, but the question is, what are we supposed to do here? He should have made some findings about lack of nexus. But for some reason, he didn't do it, which is what Chief Judge Rader is asking about. Well, there was substantial argument by Fackberg that there was this nexus. What he did is not find the nexus in spite of all the evidence. Do we need a sentence? I'm sorry? Do we need at least a sentence that says, no secondary considerations because no nexus, period? No. What he found, what all he found was that this break enabled Fackberg as a manufacturer of engine breaks. He does not make any hope that there was commercial success of this invention. With respect to the first group of findings. By the way, this case was around a long time, and a lot of that time was re-examination. What happened? Well, Your Honor, it's been around since about two months after my youngest daughter was born, and she's now a sophomore in college. That's the point. And seven years of that was, or six years, was re-exam, and at the end of that, it was... Then the case was set down for trial. More discovery was allowed. It was reset for trial. It was finally tried in 2007 to the bench. But I want you to address the re-exam. It evidently, for some reason, was upheld in kind of the point that Judge Dyke's making. There's an invention here, isn't there? Your Honor, we're not on this appeal. We certainly don't agree, but we're not contesting on this appeal, that there's an invention of delaying the timing sufficient to cause a pressure pulse, and having that be the cause of the downflow to get you supercharged. That's the invention that they went into the Patent Office and argued to the examiner, and there's a graph that they provided at page 25 of our brief. And that increases the braking horsepower from 280 up to... I look for in the record. Is there some... The comparisons in the brief are not really accurate because what Mr. Baranato is doing is comparing the 300 that we tested, the D37, with the 280, which is a combination brake, against the 280 that our engine brake alone got. There isn't evidence in the record of what our combination got to compare against the D37. So it's a little bit of apples and oranges. But there are two separate groups of inventions here. Combination is close. Okamura is closest. And granted, we're not appealing the finding of non-enablement on this fourth and bottom. But there's no need to. Mitsubishi published a series of articles describing this whole power chart system. And Seiko, the next article in the series, expressly, specifically says, it is satisfactory to substitute a J style brake, which is figure 7, for the compression release brake. That's the motivation. That's the teacher's suggestion. If the fourth and bottom doesn't work because the cam doesn't lift or it doesn't act without, Seiko specifically says, you can use the J brake. Now, Halfbrake argues it teaches away. We disagree. It doesn't. It specifically says it's satisfactory. And what they did is got a lower level of lifts by putting in heavier springs. He didn't eliminate the lifts. He didn't eliminate the caliper. You're still getting it. And the re-examination, was the examiner applying a different claim construction to the district court? Yes. How do we know that? We know that, Your Honor, from the figure that Halfbrake provided to the examiner. Which is a chart that shows their interpretation of the claim. And what they, I'm trying to find it. It's in one of the briefs, Your Honor. I believe it's in their brief. It's this chart at page 13. Of the blue brief? Of the yellow brief. And this is what the, this is the basis for Judge Shotley feeling that Halfbrake had argued before. That additional factor of supercharging, you know, crap charge, increased braking horsepower. When Halfbrake went to the PTO, they specifically argued for the examiner, no increase in cylinder pressure. Now, the problem with this is, in the PTO you're supposed to get the broadest reasonable construction of the claim. I would think the district judge would argue doing that anyway. But let's assume that that broadest reasonable construction is somehow broader than what the district court did. That can't be. What Halfbrake did here is went in and argued supercharging, increased crap charge, increased braking horsepower. Convinced the examiner. Where do I find that? That you saw. Where do I find that it argued that? Sorry, Your Honor? Where do I find that it argued that before the examiner? The argument was, it was ex parte because this is an old case. It's in the file wrapper. At the beginning of volume three of the appendix. Halfbrake's slide makes it to the examiner. Again, at page 3206. And continue for to 3217, where the same graph that I just filled out for the court appears once again. Give us that slide again. 3206 to where? To 3217. I will agree that the record is not abundantly clear that they went in and argued a different construction. But this is what they argued to the PTO. This is how they got the claims allowed under exam. By arguing supercharging. What's the best example of their arguing supercharging? The best example of their argument, Your Honor, would be this chart 3217. The only record we have is all the papers they filed after the case. We were not permitted to take the papers. This wasn't interparted. This was ex parte. It was ex parte. It's a very old application. And this is some kind of a PowerPoint that you referred us to, isn't it? Yes. It's a PowerPoint that they presented to the examiner, giving what they were arguing on the exam. With respect to the claims instructions that weren't given under Your Honor, we feel that it is abundantly correct. The specification is very clear that, for example, with respect to the supercharging, this increased track charge, the abstract says, nay. The specification, as you go through it, lists these various categories of invention, bodies, alternatives that we outlined in our brief. And the specification makes it very clear that the ethnon of the invention, this is at page 81, I'm sorry, page 81 of the court's findings, and page 548 of the record, which we passed at problem 7, line 10, that the ethnon isn't supercharging. The ethnon isn't delay time. Those are alternatives. The ethnon is simply the combination of getting the outflow, which the exhaustion at an engine break, such as Okubo and Sankai would describe, does. And the outflow is inherent. It always happens when you're running near the rated speed at any reasonable pressure. The arguments that that break is made to the contrary are all based on extreme operating conditions. It's the end goal. Did the court make formal claim construction findings? Yes, Your Honor, it did. It had a hearing several years ago and issued a transcript of the hearing and a transcript of a phone call. They followed the hearing and their support gave those constructions. And those constructions were given at the hearing record at 147 and 161 as part of the transcript where the constructions were given. But there's no formal order, construction order? No, Your Honor. There's not a separate claim construction order. They asked for one, and Judge Sotomay said that the transcripts of the telephone call were supplied. The fact rate never came back. I think you've answered your question, Judge Sotomay. The fact rate never came back and said, because through near top dead center, we're giving a different construction. We cited in our brief the portions of the transcript where we raised this unenrolled 50A motion. Specifically, we raised the two claim construction issues. And with respect to the first, the court said, yes, that's what I ruled. Turned to the parties and said, you know, but you didn't have it right. And the parties agreed. He used that as a basis for his claim to his case management for the rest of the case. In particular, with respect to the subcourt causation, there's a cite at 1596-97 during the testimony of fact rate expenditures where the court specifically said, I have construed the limitation in claim two to mean that there must be sufficient delay in the opening of the first exhaust valve to cause valve to close. That's during their case of chief. Granted, it's not in the transcript years earlier. But it's right there. And he repeats it again at 1784 to 1785 when we raised it on the 50A motion. And turned to the parties. And Mr. Veronato agreed that when this issue was raised earlier, he conceded. He didn't say, which is what I've been in the position of having to do with times that the district court decides. Your Honor, we accept your ruling. We'll be bound by it for this case. But we take accession with it and serve our rights of appeal. He didn't say that. He said, I agree. And then he asked, and then further, he said, we both agree. So we do feel that there's been a waiver here. But in any event, the court should be very comfortable with these constructions. They are abundantly correct. The specification says it's an option. It's an alternative. There's more. It's a nomination. It can be valve closed. And that's what the court restates as a teach. Your Honor, I see that I've expired on my time. So I would be happy to answer any further questions the court has. Otherwise, I'll reserve the rest of my time. Just one comment. I do think your great brief goes beyond the cross appeal and argues obviousness with respect to the claims that were found invalid, which I don't think is proper. But there it is. Thank you. Mr. Baranato, you have three minutes. Thank you, Your Honor. Your Honor, the district court made numerous findings on secondary consideration of all the paper factors. We said in our brief, in our case 25, we made findings about unexpected results, failure of others, peripheral success, copying. Unfortunately, after the obviousness analysis, he said, I have to consider the secondary considerations. But then the memo is the void of any application of the left sway. They're just ignored. So you agree he considered them? I agree. He made findings. I don't agree he considered them. Because there's no indication that he considered them. He didn't somewhere say, well, I don't know. Well, he made findings. He considered them, right? To that extent. But he did not consider them in the context of the obviousness analysis. He simply said, in the beginning of his opinion, he said, I make only findings or he makes only findings. Why would there be secondary considerations if he makes them outside of a obviousness analysis? Well, he made findings. And he made them as to these particular parts. He just didn't apply them when it came to obviousness, especially recently. And it's much like this group recently had in the cyclobenzene case that we said in our memorandum and a couple cases recently. But I'd also like to address Mr. Coyne's argument about the claim construction of the re-exam. Because frankly, I was at the re-exam here in the interview. And I'm outraged at what's being said. There was no discussion of supercharging. But they pointed to, we never raised supercharging. All we were showing there, the court's construction, which by the way, was before the patent examiner, as the judge himself found in his decision. He says, included with the re-examination request were, quote, this was, by the way, provided by Jacobs. They filed the re-exam request. So I know this flying under the radar. He said, included were excerpts from this court's claim construction. Jacobs gave them the claim construction. We didn't. They didn't. They filed the request. And the judge said, open means open so that air would flow. But it's not really clear from the re-exam what claim construction the examiner was using, right? The examiner was using the PTO claim construction, as far as I was concerned. He was doing the court's claim construction. And rejected it. I don't know what he did. At the end of the day, he agreed with us. He agreed with us. He had the court's claim construction. And he said, this invention is not anticipated. And it's not obvious. And he did that based upon the Okamura reference, which Jacobs is now arguing. And he did it based upon other references, including the Wright article, which they're arguing. And he said, this is an invention that's worked. But that didn't tell us what happened. We don't know the claim. Did he have Sato and Powertard in front of him, too? He did have Powertard in front of him. He did not have Sato, which Jacobs didn't submit, by the way, for such an important reference. As Mr. Wright testified, in effect, Sato was cumulative of the other Powertard articles. He really didn't have anything. Thank you. Thank you, Mr. Bernardo. Mr. Coyne, we're limited to claim construction at this point. Yes, Your Honor. There was a brief reference, so you can make up your point. The court has to make an independent decision on this issue. It's not found. It's not spotted. Sure, it's influential. We think they were flawed. The court has said in the arguments that were made to the Patent Office on these issues. What does that have to do with the Cross Appeal? Sorry, Your Honor. With respect to the Cross Appeal, the but-for causation is Patrick's argument on our Cross Appeal. We feel that that is the right construction. If that's taken away, and we're now on the Cross Appeal with a different kind of construction, Oak and Bird, Sato, specifically 5350 to 5151, show that supercharging. Nothing shows the but-for causation. We're not appealing those. But with respect to the rest of the claims, it's at 5350 to 5351. I hope you have any further questions the court has. Otherwise, I'll continue the rest of the time. Okay. Thank you. The next case is here.